UNITED STATES, Appellee

v.

Roberto RODRIGUEZ-RIVERA, Personnelman Second Class
U.S. Navy, Appellant

No. 05-0270

Crim. App. No. 9900859

United States Court of Appeals for the Armed Forces

Argued April 5, 2006

Decided August 9, 2006

ERDMANN, J., delivered the opinion of the court, in which
GIERKE, C.J., and EFFRON and BAKER, JJ., joined. CRAWFORD, J.,
filed a separate opinion concurring in part and in the result.

Counsel

For Appellant: Lieutenant Brian L. Mizer, JAGC, USNR (argued).

For Appellee: Major Kevin C. Harris, USMC (argued); Commander
Charles N. Purnell, JAGC, USN (on brief).

Military Judge: Kenneth A. Krantz

**This opinion is subject to revision before final publication.**

United States v. Rodriguez-Rivera, No. 05-0270/MC

Judge ERDMANN delivered the opinion of the court.

Personnelman Second Class Roberto Rodriguez-Rivera was convicted at a general court-martial of making false official statements, committing forcible sodomy on a child under twelve, taking indecent liberties with a female under the age of sixteen, and committing indecent acts with a female under the age of sixteen, in violation of Articles 107, 125 and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 925, 934 (2000).  He was sentenced to a reduction in grade to E-1, forfeiture of all pay and allowances, confinement for twelve years and a dishonorable discharge.  The convening authority approved the sentence and the United States Navy-Marine Corps Court of Criminal Appeals affirmed the findings and sentence. United States v. Rodriguez-Rivera, 60 M.J. 843, 848-49 (N-M. Ct. Crim. App. 2005).

We granted review of the following issues:[1]

> I.
> WHETHER TRIAL COUNSEL COMMITTED
> PROSECUTORIAL MISCONDUCT BY (1) VIOLATING
> THE MILITARY JUDGE'S ORDERS REGARDING
> WITNESS SEQUESTRATION; (2) BY IMPROPERLY
> COACHING THE SIX-YEAR-OLD COMPLAINING
> WITNESS DURING HER DIRECT TESTIMONY; (3) BY
> PURPOSEFULLY ALLOWING OTHER WITNESSES TO

---

[1] We heard argument in this case on April 5, 2006, at the University of Denver, Sturm College of Law, Denver, Colorado, as part of the Court's "Project Outreach."  See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).  This practice was developed as part of a public awareness program to demonstrate the operation of a Federal Court of Appeals and the military justice system.

2

IMPROPERLY COACH THE COMPLAINING WITNESS
DURING HER DIRECT TESTIMONY; (4) BY FAILING
TO BE CANDID WITH THE COURT-MARTIAL
REGARDING THE COACHING OF THE WITNESS BY
TRIAL COUNSEL AND OTHER WITNESSES; AND (5)
BY FAILING TO BE CANDID WITH THE COURT-
MARTIAL ABOUT NOTES PASSED FROM A
PROSECUTION WITNESS DURING THE DEFENSE'S
CASE.

II.
WHETHER THE MILITARY JUDGE ERRED TO THE
SUBSTANTIAL PREJUDICE OF APPELLANT BY
ADMITTING OVER DEFENSE OBJECTION, THE
INADMISSIBLE HEARSAY STATEMENTS OF THE
COMPLAINANT WITNESS.

III.
WHETHER THE MILITARY JUDGE ERRED TO THE
SUBSTANTIAL PREJUDICE OF APPELLANT BY
GRANTING THE GOVERNMENT'S CHALLENGE FOR
CAUSE OF CHIEF ELECTRONIC TECHNICIAN DANIEL
J. [ABEYTA].

IV.
WHETHER THE STAFF JUDGE ADVOCATE ERRED BY
FAILING TO SERVE APPELLANT WITH A LETTER
FROM TRIAL COUNSEL TO THE CONVENING
AUTHORITY THAT NEGATIVELY CHARACTERIZED
APPELLANT'S UNSWORN STATEMENT.

V.
WHETHER THE EVIDENCE PRESENTED ON THE MERITS
WAS LEGALLY INSUFFICIENT TO PROVE BEYOND A
REASONABLE DOUBT THAT APPELLANT TOOK
INDECENT LIBERTIES WITH JK BY WATCHING
PORNOGRAPHIC MOVIES WITH JK.

VI.
WHETHER APPELLANT WAS DENIED DUE PROCESS OF
LAW WHERE THE COMPLETION OF THE FIRST LEVEL
OF APPELLATE REVIEW TOOK MORE THAN SIX
YEARS.

BACKGROUND

From August 1997 through December 1997, Rodriguez-Rivera and his wife babysat for their neighbor's child, JK, at Royal Air Force Station, West Ruislip, England.  In March of 1998, when JK was five, she disclosed to her parents that she had been sexually abused by Rodriguez-Rivera.  The day following this disclosure, JK's mother arranged a meeting with the base Family Advocacy Representative that was also attended by a Naval Criminal Investigative Service (NCIS) agent.  Appellate Exhibit LV reflects that during this meeting JK stated that on numerous occasions Rodriguez-Rivera had sucked and kissed her "pee pee", she had sucked his "pee pee", he had showered with her and rubbed soap on her, and he had masturbated in front of her.  In addition, JK also told the NCIS agent that she had watched adult movies with Rodriguez-Rivera while in his bed.  An initial medical examination of JK disclosed no evidence of any trauma to her vagina.

During a NCIS interview, Rodriguez-Rivera denied having any improper or sexual contact with JK.  He did admit to possessing pornographic videos and allowing JK to take baths while he was babysitting her.  A search of Rodriguez-Rivera's home resulted in the seizure of pornographic videos.  Other facts relevant to the disposition of the issues are set forth in the Discussion section.

DISCUSSION

I. PROSECUTORIAL MISCONDUCT

Rodriguez-Rivera alleges that the following actions by trial counsel constituted prosecutorial misconduct: (1) violation of the military judge's orders regarding witness sequestration; (2) improperly coaching the victim; (3) allowing other witnesses to coach the victim; (4) failing to be candid with the court-martial regarding the alleged witness coaching; and (5) failing to be candid with the court-martial about notes received from a prosecution witness during the defense case. We will first consider the initial four allegations pertaining to witness coaching and then address the final allegation.

A. Witness sequestration and witness coaching allegations

1. Factual Background

JK was six years old at the time of trial. JK's testimony on direct examination was not consistent with her earlier statements to her parents and the Family Advocacy Representative. At trial JK testified only that Rodriguez-Rivera had sucked her "pee pee" more than one time and that she had seen a "sex movie . . . [a]t Rod's house" but that Rodriguez-Rivera had done nothing more. Following repeated attempts by the trial counsel to elicit additional testimony, the defense counsel requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000), session at which he asked the military judge to

5

prohibit the Government from pursuing this line of questioning as JK had testified that Rodriguez-Rivera had not done anything else to her.  The military judge sustained the defense objection on the ground that the questions had been asked and answered. Following that ruling, trial counsel asked the military judge for permission to impeach JK's testimony with her prior inconsistent statements.  Defense counsel then requested a recess to consider that issue.

Following the recess defense counsel expressed concern to the military judge that trial counsel had been in a room with JK during the break.  The assistant trial counsel explained that JK was concerned about the delay in her testimony and asked whether she had done something wrong and that he had advised her that she had not done anything wrong but she might have to continue her testimony.  The military judge then granted a defense request to voir dire JK about her understanding of what had been said to her during the break.

During voir dire the defense asked JK what had happened during the break and JK responded that she had gone to the trial counsel's office with her "momma" and "daddy."  She said that the assistant trial counsel "wanted [her] to tell him the rest of the story" and that the trial counsel told her not to be scared.  JK testified that after the trial counsel left the room her parents told her she had not told the entire story and that

she needed to go back into court and say more.  She also said
they talked to her about some of the things that had happened to
her.

     After JK's voir dire defense counsel argued to the military
judge that JK should not be allowed to testify further before
the members because she was influenced by what happened during
the break.  The Government responded that there was no need to
prohibit her from testifying because there was no evidence of
manipulation or danger of prejudice.  Both parties noted that
the facts regarding what occurred during the break could be used
to impeach JK on cross-examination and defense counsel requested
a proffer from the assistant trial counsel as to what had been
said so that he could use it for that purpose.

     The assistant trial counsel stated that JK had asked him
what was going on and whether she had done anything wrong, and
he told her "no."  He also told her that she might have to
testify again and if she did so she would need to tell the
truth.  She responded that she would tell the truth and stated
that she had already done so.  The trial counsel then said, "she
started to talk about other things," and she told him she had
not testified about Appellant putting his "pee pee" in her mouth
and about the masturbation (which she indicated by moving her
hands).  He said that the victim's parents were already in the
room when he came in and were there when he left.  When he

7

entered the room a second time trial counsel was talking to JK and "telling her not to be afraid."

The military judge ruled that the members would be allowed to hear further testimony from JK. He also noted:

> It goes without saying that the events since the last open session with the members are fair game for cross-examination along the lines of the voir dire already conducted, and to the extent that that makes the child less comfortable or makes cross-examination last longer than it otherwise would have, that's what happens when you talk to a witness, or when parents talk to a child witness during a break of this kind; issues like that arise, and I will permit the defense to explore them fully.

JK returned to the stand and detailed for the members how Rodriguez-Rivera masturbated and ejaculated on her. She indicated that he "soaped her" and washed her "pee pee" and also testified that Rodriguez-Rivera sucked her "pee pee" and she sucked his "pee pee." On cross-examination defense counsel questioned JK about what happened during the break. JK told the members that her parents and assistant trial counsel told her to tell the truth and to tell the rest of the story. In response to a member's question, JK also stated that neither her parents nor either trial counsel told her what to say "for the rest of the story."

## 2. Discussion

Prosecutorial misconduct is generally defined as "action or inaction by a prosecutor in violation of some legal norm or

United States v. Rodriguez-Rivera, No. 05-0270/MC

standard, e.g., a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." <u>United States v. Meek</u>, 44 M.J. 1, 5 (C.A.A.F. 1996); <u>United States v. Thompkins</u>, 58 M.J. 43, 47 (C.A.A.F. 2003). In analyzing allegations of prosecutorial misconduct, "courts should gauge the overall effect of counsel's conduct on the trial, and not counsel's personal blameworthiness." <u>Thompkins</u>, 58 M.J. at 47 (citing <u>Smith v. Phillips</u>, 455 U.S. 209, 220 (1982)).

Where the military judge and the lower court have made factual determinations regarding the events surrounding allegations of misconduct, we will accept those determinations unless they are clearly erroneous. <u>See</u> <u>United States v. Warner</u>, 62 M.J. 114, 124 (C.A.A.F. 2005) ("Relevant facts are drawn from the record of trial, and we accept the factual findings of the courts of criminal appeals unless they are clearly erroneous."). If prosecutorial misconduct is found, this court will examine the record as a whole to determine whether Appellant was prejudiced by the misconduct. <u>United States v. Fletcher</u>, 62 M.J. 175, 184 (C.A.A.F. 2005). This court weighs three factors in evaluating the impact of prosecutorial misconduct on a trial: (1) the severity of the misconduct; (2) the measures adopted to cure the misconduct; and (3) the weight of the evidence supporting the conviction. <u>Id.</u>

United States v. Rodriguez-Rivera, No. 05-0270/MC

   a.   <u>Violation of Sequestration Order</u>

   There was no formal sequestration order issued by the military judge at trial and the record is unclear as to whether the military judge explicitly warned JK's parents not to discuss their testimony with other witnesses.  Rodriguez-Rivera argues that a sequestration order can be implied because the military judge denied a request from the Government to allow one or both of JK's parents to be present when she testified.  The lower court found that this ruling did not amount to a formal sequestration order and we agree.  <u>Rodriguez-Rivera</u>, 60 M.J. at 847.  There may be cases, based upon the dialogue between the parties and the military judge, where there is a sound basis in the record for concluding that there was a clear, common understanding between the military judge and the parties as to sequestration, without issuance of a formal order.  In such a case, violating that clear understanding could constitute prosecutorial misconduct.  In this case, there is neither a formal nor a clearly understood sequestration order.  Unless the record demonstrates that witnesses were to be sequestrated, the prosecution cannot be found to have intentionally committed misconduct.  As a result, we conclude that there was no prosecutorial misconduct in this allegation.

United States v. Rodriguez-Rivera, No. 05-0270/MC

     b.  <u>Coaching by Trial Counsel, Assistant Trial Counsel, or
JK's Parents</u>

The lower court concluded that the military judge did not
prohibit the prosecutors from discussing JK's testimony with her
and also found that they did not discuss the substance of her
testimony with her.  <u>Id.</u>  Rather, the prosecutors did no more
than encourage JK "to testify to the whole truth rather than a
part of it."  <u>Id.</u>  The lower court concluded that there was no
prosecutorial misconduct in allowing JK's parents "to admonish
her to tell the whole truth while testifying[,]" and that "it is
appropriate and reasonable for a young child witness to remain
in the company of parents or care providers while awaiting trial
participation."  <u>Id.</u> at 847-48.

As a general matter, we have permitted greater latitude and
flexibility when it comes to treatment and testimony of child
witnesses.  <u>See</u> <u>United States v. McCollum</u>, 58 M.J. 323, 330-31
(C.A.A.F. 2003) (authorizing remote live testimony under certain
circumstances); <u>United States v. Anderson</u>, 51 M.J. 145, 150
(C.A.A.F. 1999) (upholding military judge's decision to allow a
child to testify behind a screen);  <u>United States v. Morgan</u>, 31
M.J. 43, 48 (C.M.A. 1990) (giving military judge flexibility in
determining a child's competency as a witness); <u>United States v.
Jones</u>, 26 M.J. 197, 198 (C.M.A. 1988) (permitting trial counsel
to lead retarded, seventeen-year-old witness); <u>see also</u> <u>Paramore
v. Filion</u>, 293 F. Supp. 2d 285, 292 (S.D.N.Y. 2003) ("[C]ourts

11

generally recognize that child witnesses present special challenges when testifying in sexual abuse cases and that these challenges must be recognized and accommodated.").

JK testified that the assistant trial counsel "wanted [her] to tell him the rest of the story" and that the trial counsel told her not to be scared.  The assistant trial counsel testified that JK volunteered these incidents in response to his telling her that she needed to be sure to tell the truth.  While JK did testify that she and her parents discussed incidents with Rodriguez-Rivera which she did not initially mention at trial, she went on to state that they discussed the incidents because her previous testimony "wasn't the whole story."  The lower court's findings that both trial counsel and JK's parents did nothing more than encourage JK to tell the truth and to tell the whole story was not clearly erroneous.  We therefore conclude that no prosecutorial misconduct occurred.

While we conclude there was no prosecutorial misconduct, we also note that to the extent the military judge did have concerns about any influence the discussion during the break may have had on JK, he mitigated that influence by allowing cross-examination of JK concerning the events during the break and the possibility that JK was coached or coerced.  Defense counsel asked JK several questions about these events during cross-examination.  If there was any danger that the meetings with JK

might have influenced her testimony, the members were made fully aware of this possibility.

      c.   <u>Assistant Trial Counsel's Candor Regarding the Discussions that Occurred During the Break</u>

The military judge and the lower court also found no merit in Rodriguez-Rivera's contentions that trial counsel was less than candid about the discussions that occurred during the break. <u>Rodriguez-Rivera</u>, 60 M.J. at 848. The military judge told assistant trial counsel:

> It is equally clear that [JK's] perceptions of the meeting are different from yours, and we are dealing with a child and the perceptions of a child, and the emotional impact of adult behavior on a child, so the difference in perception doesn't cause me to doubt the accuracy of your summary, but it is the impact on the child witness that counts.

While there was some disagreement about the discussions that occurred between JK, both trial counsel, and JK's parents, we agree that in this case a difference in perception between the assistant trial counsel and a child witness is not a sufficient basis for finding that the assistant trial counsel was dishonest with the military judge. We conclude that the lower court's finding that the assistant trial counsel was candid regarding the discussions that occurred during the break was not clearly erroneous. Therefore, we conclude that there was no prosecutorial misconduct arising from this allegation.

B.  Notes from a witness during the trial

1.  Factual Background

At trial the Government called Captain Barbara Craig, a pediatrician who had examined JK, as an expert witness.  During the defense case Dr. Craig was observed passing notes to the trial counsel.  When the Government recalled Dr. Craig to testify on rebuttal, the defense objected on the basis that Dr. Craig had listened to other witnesses and had collaborated with the Government by passing notes to the trial counsel during the trial.

The military judge ruled that the trial counsel had to turn over the notes that Dr. Craig had passed to trial counsel. Trial counsel objected because the notes contained notations made by the trial counsel.  The military judge permitted trial counsel to redact those notations, and the court then took a short recess.  When the court reconvened, trial counsel advised the military judge that the notes that Dr. Craig had passed were not written by Dr. Craig, but that Dr. Craig was merely relaying notes passed to trial counsel from other people.  The military judge accepted trial counsel's explanation, allowed Dr. Craig's rebuttal testimony and did not require trial counsel to turn over the notes.

## 2. Discussion

Rodriguez-Rivera asserts that the trial counsel exhibited a lack of candor about notes passed to him by Dr. Craig during the defense's case. In ruling that Dr. Craig's rebuttal testimony would be allowed, however, the military judge accepted trial counsel's explanation that Dr. Craig was passing notes from someone other than Dr. Craig herself. The military judge had the opportunity to observe the proceedings and the explanation of the trial counsel. We see no basis in the record to conclude that the military judge's finding that trial counsel was candid with regard to this incident was clearly erroneous. Therefore, there is no basis to conclude that prosecutorial misconduct occurred with regard to these notes.

## C. Conclusion

In summary, we find that Rodriguez-Rivera has failed to meet his burden of showing that the lower court's determinations concerning the facts underlying the allegations of prosecutorial misconduct were clearly erroneous. We therefore affirm the Court of Criminal Appeals on these issues.

## II. ADMISSIBILITY OF DR. CRAIG'S TESTIMONY REGARDING STATEMENTS MADE BY JK

### A. Factual Background

After JK reported the incidents to her mother she was examined by Commander V. D. Morgan, a doctor at the Navy Medical Clinic in London. Doctor Morgan concluded that there was "zero

evidence of trauma or infection to [JK's] genitalia or anus."
JK's mother sought to have her examined by someone who was "[a]
specialist in child sex abuse cases," and tried unsuccessfully
to make an appointment with a specialist in London.  She then
renewed a request to her command that she be transferred to the
United States to find the proper care for JK.

After JK and her family returned to the United States, JK
was examined by Dr. Craig, an experienced pediatrician and
director of the Armed Forces Center for Child Protection at the
National Naval Medical Center at Bethesda, Maryland.  Dr. Craig
was recommended to JK's parents by trial counsel who also
contacted Dr. Craig to request that she see JK.  Dr. Craig's
examination of JK occurred the same day as Rodriquez-Rivera's
Article 32, UCMJ, 10 U.S.C. § 832 (2000), hearing was held.

At trial, Dr. Craig testified regarding her medical
examination of JK and her subsequent conclusion that JK had
injuries consistent with "some kind of penetrating injury . . .
."  Dr. Craig testified that her examination of JK was necessary
because JK "had not yet had a thorough medical evaluation" and
she noted that Dr. Morgan was a "family practitioner" who "does
not specialize in child sexual abuse."  She also testified that
JK told her a "person named Rod touched her genital area with
his mouth, and that she touched that person's penis with her
mouth . . . ."

16

Prior to trial, Rodriguez-Rivera made a motion to exclude the testimony of Dr. Craig concerning statements made to her by JK on the grounds that it was inadmissible hearsay. He argued that the purpose of Dr. Craig's examination was not medical diagnosis or treatment but rather it was "done for the purposes of litigation." In ruling upon the motion, the military judge considered an affidavit from Dr. Craig. In that affidavit Dr. Craig stated that trial counsel "was aware that there are very few pediatricians in the military with clinical experience in [child sexual abuse] . . . ." Therefore, the purpose of her examination was to "conduct a thorough medical examination" and to give a "second opinion regarding [JK]'s health and if she needed any further medical or psychological intervention . . . ." Dr. Craig explained to JK why she was seeing her and JK expressed her understanding that "doctors make you better" and that she had to tell the doctor the truth about what was wrong in order to get better. The military judge denied the motion and found that the testimony was admissible on the basis of Military Rule of Evidence (M.R.E.) 803(4), the medical diagnosis and treatment exception to the hearsay rule.

B. <u>Discussion</u>

M.R.E. 803(4) provides an exception to the general hearsay rule and allows the admission of statements made for the purpose of medical diagnosis or treatment.

United States v. Rodriguez-Rivera, No. 05-0270/MC

> Statements which are offered as exceptions
> to hearsay under Mil. R. Evid. 803(4) must
> satisfy two conditions:  first the
> statements must be made for the purposes of
> "medical diagnosis or treatment"; and
> second, the patient must make the statement
> "with some expectation of receiving medical
> benefit for the medical diagnosis or
> treatment that is being sought."

United States v. Edens, 31 M.J. 267, 269 (C.M.A. 1990) (quoting United States v. Deland, 22 M.J. 70, 75 (C.M.A. 1986)).  The military judge found that the "criteria for the medical hearsay exception have been met in this case" and denied the defense motion to exclude Dr. Craig's testimony regarding statements made to her by JK.  The military judge's decision to admit this evidence is reviewed by this court for abuse of discretion. United States v. Hollis, 57 M.J. 74, 79 (C.A.A.F. 2002).

Rodriguez-Rivera argues that since the examination with Dr. Craig was arranged by the trial counsel the same day as Rodriguez-Rivera's Article 32, UCMJ, hearing, the examination clearly was not for the purpose of medical treatment but rather was for the purpose of allowing hearsay testimony into evidence through M.R.E. 803(4).  This court has previously concluded that the referral of a victim to a medical professional by trial counsel "is not a critical factor in deciding whether the medical exception applies to the statements she gave to those treating her.  The critical question is whether she had some

18

expectation of treatment when she talked to the caregivers."
United States v. Haner, 49 M.J. 72, 76 (C.A.A.F. 1998).

The military judge's finding that the "criteria for the medical hearsay exception have been met in this case" are supported by Dr. Craig's affidavit.  Dr. Craig explained to JK why she was coming to see her and JK expressed her understanding that "doctors make you better" and that she had to tell the doctor the truth about what was wrong in order to get better. The purpose of Dr. Craig's examination was to "conduct a thorough medical examination" and to provide a "second opinion regarding [JK]'s health and if she needed any further medical or psychological intervention . . . ."

Under the circumstances of this case, the fact that trial counsel initiated the examination of JK by Dr. Craig is not a sufficient reason to hold that the military judge's findings were clearly erroneous.  When she was referred to see Dr. Craig JK had not been seen by a doctor who specialized in child sexual abuse cases despite her mother's repeated attempts to have her seen by such an expert.  Furthermore, Dr. Craig had extensive experience in treating suspected victims of child sexual abuse and was qualified to provide the type of examination that JK needed and had been unable to obtain.  Because the military judge's findings that Dr. Craig saw JK for the purpose of medical diagnosis and treatment, and that JK expected to receive

19

medical treatment when she saw Dr. Craig were not clearly

erroneous, we hold that his decision to admit the statements

made by JK to Dr. Craig under M.R.E. 803(4) was not an abuse of

discretion.[2]

III.  CHALLENGE FOR CAUSE OF CHIEF ABEYTA

    A.  Factual Background

    During the voir dire of potential members, Chief Electronic

Technician (ETC) Daniel J. Abeyta stated that he believed

"children can be coerced just a little bit easier [than adults]"

and that because a child was nervous he or she might be more

likely to "just say what they think you want them to say."  He

also had the following exchange with trial counsel:

> TC:  Would you be able to follow an instruction
> telling you that the testimony of one
> witness whom you believe should be enough to
> make a decision in this case.  In other
> words, if the government, if we only present
> one witness but you believed that witness is
> that going to be enough for you to make a
> decision in this case without any other
> testimony or evidence?
>
> MBR (ETC ABEYTA):  It would depend on what the
> witness said?

---

[2] While not the situation here, we note that military judges must remain vigilant in ensuring that the hearsay exception for statements made for the purposes of medical diagnosis or treatment is not used as a subterfuge.  In this case, while trial counsel could have reasonably anticipated that Dr. Craig would testify regarding JK's medical condition as a result of trial counsel's referral, the record also reflects that Dr. Craig legitimately saw JK for the purpose of medical diagnosis and treatment.

TC:   But just as a general concept, if that is
      all we gave you, is that going to be enough,
      or are you going to kind of want something
      more?

MBR (ETC ABEYTA):   I would want more.  Let me put
      it that way.

TC:   What about if that witness were a child?
      Would you even feel more like they would
      need more to corroborate that or wouldn't it
      make a difference if it was an adult vice
      [sic] a child?

MBR (ETC ABEYTA):   Either way, if it was an adult
      or a child, one witness might not be enough.

TC:   Okay.  Because you feel like the government
      needs to give you more than that?

MBR (ETC ABEYTA):   I feel it is the government's
      obligation to come up with as much evidence
      as possible.

TC:   Do you understand that sometimes the
      circumstances of the allegations make it so
      that there is actually only one person who
      actually witnessed a particular event?

MBR (ETC ABEYTA):   Yes.

TC:   Okay.  So bearing that in mind, would you
      still feel you kind of needed something else
      to corroborate that or another witness'
      testimony to sort of enhance the other
      person's testimony?

MBR (ETC ABEYTA):   Being there only one witness
      and --

TC:   For example in this case, you know, from the
      charge sheet you can see that there are
      allegations of child sexual abuse.  Clearly
      that is the type of situation where there
      may be only one eyewitness.  So, based on
      that, would you feel that if you only had
      one witness come into court that you would

> still kind of want something to corroborate
> that?

MBR (ETC ABEYTA):  Yes, I might want a little bit
    more, and, like I said, it would depend on
    what the witness would say if their [sic]
    testimony --

TC:  But in general you would feel like you
    wanted something more than that?

MBR (ETC ABEYTA):  In general, yes.

The Government challenged three members for cause including Abeyta.  The Government argued that all three members had indicated they would require more than the testimony of the child witness to convict someone of child abuse and that such statements indicated they would place a higher burden on the prosecution than the law requires.  The defense did not object to the challenge of one of the members, but argued that there was insufficient basis for excusing either of the other two. The military judge denied the challenge against one of the other two members but granted the prosecution's challenge for cause against Abeyta.  The military judge explained that he granted the challenge:  "Because of his views not only on wanting more than the testimony of one witness but of his view on the potential suggestibility or coercibility of children and vulnerability to having answers guided."

B.  Discussion

In evaluating a military judge's ruling on a challenge for cause, this court has found it appropriate to recognize the

22

military judge's superior position to evaluate the demeanor of court members. United States v. McLaren, 38 M.J. 112, 118 (C.M.A. 1993). We will not, therefore, reverse a military judge's ruling on a challenge for cause absent a clear abuse of discretion. Id.; United States v. White, 36 M.J. 284, 287 (C.M.A. 1993). We also have noted that there is "no basis for application of the 'liberal grant' policy when a military judge is ruling on the Government's challenges for cause." United States v. James, 61 M.J. 132, 139 (C.A.A.F. 2005).

The burden at trial is on the Government to prove every element of the offenses charged beyond a reasonable doubt. The testimony of only one witness may be enough to meet this burden so long as the members find that the witness's testimony is relevant and is sufficiently credible. See United States v. McGinty, 38 M.J. 131, 132 (C.M.A. 1993) (determination that one witness is more believable than another is sufficient); United States v. Arias, 3 M.J. 436, 437-38 (C.M.A. 1977) (evidence legally sufficient where "the accused's guilt turned 'basically' upon whether the trial judge believed the child or the accused"); see also Weiler v. United States, 323 U.S. 606, 608 (1945) ("Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment to prefer the testimony of a single witness to that of many."); Paramore, 293 F. Supp. 2d at 293 ("In some states, including New

York, children's uncorroborated sworn testimonies are legally sufficient to convict a defendant on criminal charges."). If a potential member states he would require the Government to produce more evidence than the testimony of one witness in order to find any element beyond a reasonable doubt, then he is holding the Government to a higher standard than the law requires and should not be allowed to sit on the panel.

Abeyta's responses to questioning by the trial counsel clearly indicated that he would want "a little bit more" than just the testimony of one witness in order to conclude that the Government had met its burden. Even when he agreed that there might only be one witness in a case of child sexual abuse such as this one, he persisted in his belief that he would want the Government to provide additional evidence. He did not waiver in his stance, even when trial counsel gave him the opportunity to clarify or change his position. Because Abeyta maintained that he would require more than the testimony of one witness for the Government to meet its burden, we conclude that the military judge did not abuse his discretion in granting the Government's challenge for cause against Abeyta. We recognize that defense counsel attempted to rehabilitate Abeyta, but that rehabilitation fell short of establishing sufficient grounds upon which to conclude that the military judge abused his discretion in granting the challenge for cause.

24

IV.  FAILURE TO SERVE COMMENTS ON RODRIGUEZ-RIVERA'S UNSWORN STATEMENT

   A.  Factual Background

   Before the convening authority acted on the case, Rodriguez-Rivera submitted a request for clemency.  The request was sent through the trial counsel, who forwarded the request to the convening authority with a note that read:

> Recommend denial due to the serious nature of the crimes this criminal committed upon a four and five year old girl over a five-month period of time.  In addition, when given the opportunity during his unsworn statement in the sentencing phase of the trial, the accused failed to exhibit any remorse whatsoever for what he had done to this little girl and her family.

This note was never served on Rodriguez-Rivera.

   B.  Discussion

   Rule for Courts-Martial 1107(b)(3)(A) requires that prior to taking action on a court-martial sentence a convening authority must consider the results of trial, the recommendation of the staff judge advocate and any clemency submission from the accused.  Rule for Courts-Martial 1107(b)(3)(B)(iii) further provides that the convening authority may also consider additional matters that he deems appropriate but "if the convening authority considers matters adverse to the accused from outside the record, with knowledge of which the accused is not chargeable, the accused shall be notified and given the opportunity to rebut."

United States v. Rodriguez-Rivera, No. 05-0270/MC

The Government and Rodriguez-Rivera disagree on whether the trial counsel's note constitutes a matter adverse to Rodriguez-Rivera from outside the record. However, we need not reach that question because we conclude that there was no prejudice to Rodriguez-Rivera from the inclusion of comment on his clemency request. See United States v. Farley, 60 M.J. 492, 493 (C.A.A.F. 2005) ("We need not decide whether there was error, because any error was harmless."); United States v. Phanphil, 57 M.J. 6, 11 (C.A.A.F. 2002) ("We need not resolve the conflicting interpretations of 18 U.S.C. § 922(a) because any error was harmless beyond a reasonable doubt.").

Where "matters adverse to the accused from outside the record" have been erroneously considered by the convening authority, this court has stated:

> [W]e will require appellant to demonstrate prejudice by stating what, if anything, would have been submitted to "deny, counter, or explain" the new matter. . . . We believe that the threshold should be low, and if an appellant makes some colorable showing of possible prejudice, we will give that appellant the benefit of the doubt and "we will not speculate on what the convening authority might have done" if defense counsel had been given an opportunity to comment.

United States v. Chatman, 46 M.J. 321, 323-24 (C.A.A.F. 1997) (citing Unites States v. Jones, 44 M.J. 242, 244 (C.A.A.F. 1996); United States. v. DeGrocco, 23 M.J. 146, 148 (C.M.A. 1987)). Rodriguez-Rivera asserts that the trial counsel

26

inaccurately characterized his unsworn statement by stating that he showed no remorse. He argues he would have rebutted this characterization by showing that "the accused did show remorse during his unsworn statement in that he cried and apologized to the Navy, his command, and to his shipmates. In addition he asked for the mercy of the Court."

Rodriguez-Rivera's assertions regarding his proposed rebuttal to trial counsel's statements do not rise to a "colorable showing of possible prejudice." Chatman, 46 M.J. at 324. We have examined the unsworn statement in detail. Contrary to Rodriguez-Rivera's claim, his unsworn statement did not express remorse for his misconduct or for his victim. His apology was directed to his "shipmates, my command and the Navy" and was for any "inconvenience that I caused" rather then for any harm to the victim. At no point did Rodriquez-Rivera express any regret or similar emotion toward the victim or her family. The proposed rebuttal to trial counsel's statement was, in short, inaccurate. Thus, we conclude that whether or not there was error in failing to serve trial counsel's comments upon the defense, Rodriguez-Rivera has failed to sustain his burden of making a colorable show of prejudice.

V.  LEGAL SUFFICIENCY OF THE EVIDENCE

   A.  Factual Background

Specification 3 of Charge III alleges that Rodriguez-Rivera took indecent liberties with JK, a female under the age of sixteen, by watching pornographic movies with her.  JK testified that she saw a "sex movie . . . [a]t Rod's house . . . [i]n his bedroom."  She testified that the "sex movie" had a lady with red shoes in it and that the lady had long hair.  She also testified that "[a]ll of [the movies] had ladies and boys."

Trial counsel asked her whether she or Rodriguez-Rivera got the movie and she responded that she "didn't know because I saw it when I was there.  I didn't know when he bought it."  When asked whether she or Rodriguez-Rivera put the movie "in the machine to play it" she responded that she did not remember.  A member asked if "anyone else ever show[ed her] a sex movie any other time, except for Mr. Rod" and she answered "no."  A pornographic tape was admitted at trial and a portion shown to the members containing a scene with a woman with red shoes matching JK's description.

At the close of the Government's case, trial defense counsel made a motion to dismiss the indecent liberties specification and a separate specification alleging, in part, that Rodriguez-Rivera made a false official statement by denying that he watched pornographic videos while JK was in his home.

United States v. Rodriguez-Rivera, No. 05-0270/MC

Trial defense counsel argued there was no evidence Rodriguez-Rivera watched pornographic movies with the victim or gave a false official statement when he stated he "never watched pornographic videotapes while JK was in his home."  In making findings of fact on the motion, the military judge stated he did not find evidence that Rodriguez-Rivera "ever watched pornographic videotapes while [JK] was in his home."  He granted the defense motion to dismiss the portion of the specification alleging that Rodriguez-Rivera had made a false official statement regarding this incident.  However, the military judge declined to dismiss the indecent liberties specification which alleged that Rodriguez-Rivera watched a pornographic movie with JK.

   B.  Discussion

   In determining whether the evidence is legally sufficient, we "'view[] the evidence in the light most favorable to the prosecution'" and decide whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  United States v. Brown, 55 M.J. 375, 385 (C.A.A.F. 2001) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  The specification at issue here alleges that Rodriguez-Rivera took indecent liberties with JK by watching pornographic movies with her.  The Manual for Courts-Martial, United States (2005 ed.) (MCM) provides that "[w]hen a person is

charged with taking indecent liberties, the liberties must be taken in the physical presence of the child . . . ." MCM pt. IV, para. 87.c(2). We must determine, therefore, whether a rationale trier of fact could find beyond a reasonable doubt that Rodriguez-Rivera was physically present with JK when she watched pornographic movies at his house.

We first note that the military judge specifically concluded that he did not find any evidence Rodriguez-Rivera "ever watched pornographic videotapes while [JK] was in his home." Looking at the record in its entirety, we see no evidence that could lead a reasonable member to conclude that Rodriguez-Rivera watched the pornographic movie "with" JK.[3] While there is evidence to establish that JK watched a pornographic movie at Rodriguez-Rivera's house, she never testified that he was present when she did so. She testified that she did not know or did not remember how the tape got to the house or who put it in the machine to play it. Viewing the evidence in the light most favorable to the prosecution, we find that there is no basis in the record to conclude that Rodriguez-Rivera was present when JK watched the pornographic videotape.

---

[3] During her meeting with the Family Advocacy Representative and the NCIS agent, JK did state that she watched the movies while in bed with Rodriguez-Rivera at his home. The written summary of that meeting was admitted as an appellate exhibit but was not admitted as a trial exhibit and therefore was not before the members.

Accordingly, we will reverse the lower court and set aside the guilty finding for Specification 3 of Charge III. However, because we conclude that this error was harmless with regard to sentencing we will not order a rehearing or reassessment and will affirm the sentence as approved by the lower court. See Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000).

VI. APPELLATE DELAY

In analyzing whether appellate delay has violated the due process rights of an accused we first look at whether the delay in question is facially unreasonable. United States v. Moreno, 63 M.J. 129, 136 (C.A.A.F. 2006). If it is, then this court examines and balances the four factors set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. Moreno, 63 M.J. at 135-36; United States v. Jones, 61 M.J. 80, 83 (C.A.A.F. 2005); Toohey v. United States, 60 M.J. 100, 102 (C.A.A.F. 2004). If we conclude that an appellant has been denied the due process right to speedy post-trial review and appeal, "we grant relief unless this court is convinced beyond a reasonable doubt that the constitutional error is harmless." United States v. Toohey, 63 M.J. __ (24) (C.A.A.F. 2006). Whether an appellant has been denied the due process right to a speedy post-trial review and appeal, and whether constitutional

error is harmless beyond a reasonable doubt are reviewed de

novo.  United States v. Cendejas, 62 M.J. 334, 337 (C.A.A.F.

2006) (constitutional error); United States v. Kreutzer, 61 M.J.

293, 299 (C.A.A.F. 2005); United States v. Rodriguez, 60 M.J.

239, 246 (C.A.A.F. 2004) (due process); United States v. Cooper,

58 M.J. 54, 58 (C.A.A.F. 2003) (due process).

As a general matter, we can dispose of an issue by assuming

error and proceeding directly to the conclusion that any error

was harmless.  See United States v. Gorence, 61 M.J. 171, 174

(C.A.A.F. 2005) (any error in permitting evidence of preservice

drug use was harmless); United States v. Lovett, 59 M.J. 230,

234 (C.A.A.F. 2004) (assuming error in admitting hearsay, the

error was harmless); United States v. Bolkan, 55 M.J. 425, 428

(C.A.A.F. 2001) (any error in defense counsel's concession that

a punitive discharge was an appropriate punishment was

harmless).  Similarly, issues involving possible constitutional

error can be resolved by assuming error and concluding that the

error is harmless beyond a reasonable doubt.  See United States

v. Cuento, 60 M.J. 106, 111 (C.A.A.F. 2004) (assuming that there

was error and that the error was of constitutional dimension,

error was harmless beyond a reasonable doubt); see also United

States v. Saintaude, 61 M.J. 175, 183 (C.A.A.F. 2005) (court

need not determine whether counsel's performance was

constitutionally deficient where it can determine that any such

error would not have been prejudicial).  Thus, in cases involving claims that an appellant has been denied his due process right to speedy post-trial review and appeal, we may look initially to whether the denial of due process, if any, is harmless beyond a reasonable doubt.  We will apply a similar analysis where, even though the denial of due process cannot be said to be harmless beyond a reasonable doubt, there is no reasonable, meaningful relief available.

Assuming that the delay of over six years to complete Rodriguez-Rivera's appeal of right denied him his right to speedy review and appeal, we decline to afford additional relief.  In Moreno, we set forth a non-exhaustive list of the types of relief available for denial of speedy post-trial review or appeal.  63 M.J. at 143.  We have considered the totality of the circumstances and the types of relief that may be appropriate here, in addition to setting aside the findings of guilty to Specification 3 of Charge III.  Because Rodriguez-Rivera has served his full term of confinement, reduction of the confinement or confinement credits would afford him no meaningful relief.  Further, reduction of adjudged forfeitures would have no meaningful effect in light of the provisions for automatic forfeitures.  See Article 58b, UCMJ, 10 U.S.C. § 858b (2000).  Reducing the period of confinement enough to have a significant impact upon collected forfeitures would also require

a dramatic reduction in the period of confinement that is unwarranted under the circumstances of this case.

In coming to this conclusion, we have not lost sight of the fact that Rodriguez-Rivera was deprived, for more than six years, of the resolution of a legal claim on which he prevailed and for which he was entitled to dismissal of certain of the guilty findings against him.  However, to fashion relief that would be actual and meaningful in this case would be disproportionate to the possible harm generated from the delay. Accordingly, we conclude that no additional relief is appropriate or warranted in this case.

CONCLUSION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals as to the finding of guilty to Specification 3 of Charge III is reversed.  The finding of guilty to Specification 3 of Charge III is set aside and that specification is dismissed.  The decision of the United States Navy-Marine Corps Court of Criminal Appeals as to the remaining findings and the sentence is affirmed.

<u>United States v. Rodriguez-Rivera</u>, No. 05-0270

CRAWFORD, Judge (concurring in part and in the result):

I agree with the majority as to all the issues except Issue VI (APPELLATE DELAY) and the affirmance of the remaining findings and sentence. I dissociate **myself**, however, from this Court's analysis of that issue and its conclusion that Appellant was denied his due process right to speedy review and appeal. This Court's analysis and conclusion are based on a prospective rule set forth in <u>United States v. Moreno</u>, 63 M.J. 129 (C.A.A.F. 2006), and its misapplication of the <u>Barker v. Wingo</u>, 407 U.S. 514 (1972), test. See <u>Moreno</u>, 63 M.J. at 144 (Crawford, J., concurring in part and dissenting in part).