# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40590**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Davon M. CHING**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 7 March 2025

————————————

*Military Judge*: Elijah F. Brown.

*Sentence*: Sentence adjudged on 17 February 2023 by GCM convened at Joint Base Elmendorf-Richardson, Alaska. Sentence entered by military judge on 29 March 2023: Confinement for 35 days, hard labor without confinement for 8 days, forfeiture of $200.00 pay per month for 2 months, reduction to E-2, and a reprimand.

*For Appellant*: Major Nicole J. Herbers, USAF; Major Frederick J. Johnson, USAF.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Brittany Speirs, USAF; Major Jocelyn Q. Wright, USAF; Captain Morgan L. Brewington, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Judge GRUEN delivered the opinion of the court, in which Chief Judge JOHNSON and Judge WARREN joined.

————————————

---

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.).

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

GRUEN, Judge:

A general court-martial consisting of a military judge alone convicted Appellant, contrary to his pleas, by exceptions and substitutions of one specification of willful disobedience of a superior commissioned officer on divers occasions (violating a protective order) in violation of Article 90, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 890, and two specifications of domestic violence against a spouse in violation of Article 128b, UCMJ, 10 U.S.C. § 928b.[2] Consistent with his pleas, Appellant was acquitted of one specification of communicating a threat in violation of Article 115, UCMJ, 10 U.S.C. § 915, and four specifications of domestic violence against a spouse in violation of Article 128b, UCMJ, 10 U.S.C. § 928b. The military judge sentenced Appellant to confinement for 35 days, hard labor without confinement for eight days, forfeiture of $200.00 pay per month for two months, reduction to the grade of E-2, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant raises two issues on appeal which we have rephrased: (1) whether Appellant's conviction for disobeying a superior commissioned officer on divers occasions in the Specification of Charge I is legally and factually sufficient, and (2) whether Appellant's convictions for domestic violence in Specifications 2 and 6 of Charge III are factually sufficient.[3] We agree with Appellant as to factual sufficiency on issue (1), and set aside findings and reassess his sentence. With respect to issue (2), we find no error that materially prejudiced Appellant's substantial rights and affirm the findings of guilty as to Specifications 2 and 6 of Charge III.

## I. BACKGROUND

Appellant enlisted in the Air Force on 21 January 2020. The allegations in this case regard Appellant's volatile marriage to JC, his ex-wife. Appellant and JC met in technical school, were married by double proxy, and moved in together when Appellant arrived at Joint Base Elmendorf-Richardson in October 2020, where JC was already stationed.

_____

[2] Unless otherwise noted, all references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] Appellant personally raises issue (2) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## A. Domestic Violence Incidents

Specification 2 of Charge III alleges Appellant committed bodily harm by unlawfully slapping his spouse JC in the face with his hand with force or violence. JC testified that, between 1 July 2021 and 30 November 2021, she was at their home in the bathtub of their bathroom, and was crying. Appellant "came in the bathroom when he heard [her] crying and in an angry tone, he asked [her] why [she] was crying." JC told Appellant that she was crying because "he strangled [her] again earlier that day." After her response, Appellant "started to yell, and then, [she] started to yell, and he slapped [her] in the face" with his hand. She started crying even more and did not retaliate because she "was still in shock."

Specification 6 of Charge III alleged Appellant committed bodily harm by unlawfully grabbing his spouse JC's arm with his hand with force or violence. JC testified that sometime in the charged timeframe, May 2022, she was walking to her car and in the same parking lot Appellant was walking towards her. They met and she told him that she "didn't want to talk to him and [she] wanted him to get away." Nevertheless, he followed her to her car. JC got into the driver's seat and Appellant got into the seat directly behind the driver's seat. CCTV video shows their interaction and them getting into the car, and was admitted as Prosecution Exhibit 1 at Appellant's court-martial. JC went on to explain that once they were in the car she told him to get out and that she was going to call their first sergeant. As she started to dial their first sergeant on her cell phone, Appellant "held [her] arm and grabbed [her] phone out of [her] hand." She said Appellant was aggressive in these actions.

## B. Protective Orders

It was by 19 November 2021 that the relationship between Appellant and his spouse JC had devolved and their disputes resulted in Appellant's commander issuing him a military protective order (MPO) with JC listed as the "protected person" in that order. Appellant's commander issued him subsequent, similar in nature, orders on 3 and 9 December 2021. Each order directed:

> The above-named Service member [Appellant] is restrained from initiating any contact or communication with the above-named protected person [JC] either directly or through a third party. For purposes of this order, the term "communication" includes, but is not limited to, communication in person, or through a third party, via face-to-face contact, telephone, in writing by letter, data fax, electronic mail or via the internet or social

media. If the protected person initiates any contact with the Service member, the Service member must immediately notify me regarding the facts and circumstances surrounding such contact.

On 9 December 2021, JC was also issued a MPO with Appellant listed as the "protected party" virtually mirroring the terms contained in Appellant's MPOs. The 9 December 2021 orders for both Appellant and JC remained effective through the date of the charged offenses.

The Government charged Appellant with violating the protective orders, specifically having received a lawful command from his superior commissioned officer, Major (Maj) AG, restricting Appellant from initiating electronic contact with JC, and did, on divers occasions, willfully disobey the same. In the charged offenses and at Appellant's court-martial, the Government offered two theories by which Appellant initiated electronic contact with JC in violation of Maj AG's orders via the MPOs. First, the Government alleged tweets made on Appellant's Twitter[4] account and in information located on his profile for the Twitter account violated the MPO, and the second violation was allegedly evidenced by a notification from JC's Apple iPhone "Find My" application (app) regarding an auto-generated push notification from an account named "Davon Ching [email address]" that informed JC someone at that email address was searching for her location.

With respect to tweets, JC testified that she "happened to come across messages" Appellant tweeted in which she was the subject, and so she chose to screenshot the tweets and provide them to law enforcement. Specifically, JC testified Twitter is "a forum to put thoughts, re-tweet thoughts, reviews, that you are able to publish your own tweets and things like that." She confirmed she and Appellant had Twitter accounts between April and May 2022. When asked if she happened to come across some messages of Appellant on Twitter during that time frame that were directed towards her, she said "yes I did." Trial counsel then provided JC with Prosecution Exhibit 3 and asked what it was, to which JC replied it was screenshots she took of Appellant's profile and tweets on or about 29 April 2022. JC further confirmed the name, handle, and picture associated with the Twitter account belonged to Appellant. No further evidence or testimony was presented on this issue. There is no testimony or

---

[4] Twitter was a social media platform which allowed users to publish short messages called "tweets," and to republish, quote, or respond to other users' tweets. Each Twitter account included a "handle," which is an "@" symbol followed by a unique identifier. Users could post "tweets," which were short messages up to 280 characters in length, to a page on Twitter that was attached to the user's account. *See generally Fasking v. Merrill*, Case No. 2:18-cv-809-JTA, 2023 U.S. Dist. LEXIS 4145, at *2 (M.D. Ala. 10 Jan. 2023).

evidence that Appellant directly messaged JC to convey any of the thoughts or used her handle in any tweets or in any other way attempted to initiate communication with JC through these tweets. While Appellant's "bio" section of his Twitter profile included a note that read, "[JC], I love you Forever [bride emoji]," and included, "@ [JC] [yellow heart emoji]," there is no evidence as to when he included this information on his profile page.

With respect to Appellant allegedly looking for JC's location on an iPhone app, JC testified that "Find My" is "an application used to find your friends if you choose to give them your location, as well as other Apple products that you own." She stated that the name under the "Find My" screenshot notice she took was Appellant's. She believed the email address, if letters in the address were switched around, would spell Appellant's first name. She further stated she had an iPhone and used the "Find My" app multiple times and that she and Appellant had used the app previously and consensually to track each other. JC testified that the location request notification in issue would have popped up on her phone due to "[s]omebody requesting to follow [her] location or see where [she is] at." In her opinion, seeing Appellant's name under the "Find My" app meant that Appellant was trying to find her location. She did not testify that Appellant reached out to her directly or through a third party to ask if he could track her or directly inquired of her as to her whereabouts. This was the extent of the evidence on this issue.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction for disobeying his superior commissioned officer on divers occasions; and challenges the factual sufficiency for the two convictions of domestic violence against his spouse JC.

#### 1. Law

We review issues of legal sufficiency de novo. *United States v. Harrington,* 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019)). Our assessment of legal sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result,

"[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *Id*. (citations omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, ___ M.J.___, No. 23-0210, 2024 CAAF LEXIS 590, at \*9 (C.A.A.F. 7 Oct. 2024) (internal quotation marks and citation omitted).

The National Defense Authorization Act for Fiscal Year 2021 significantly changed how Courts of Criminal Appeals (CCAs) conduct factual sufficiency reviews. Pub. L. No. 116-283, § 542(b)(1)(B), 134 Stat. 3388, 3612 (1 Jan. 2021). Previously, the test for factual sufficiency required the court, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, to be convinced of the appellant's guilt beyond a reasonable doubt before it could affirm a finding. *See United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). "In conducting this unique appellate role, we [took] 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (second alteration in original) (quoting *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002) (applying the version of Article 66(c), UCMJ, in effect prior to 2019)); *see also United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *Wheeler* and applying the same factual sufficiency test in the context of Article 66(d), UCMJ, effective 1 January 2019).

The current version of Article 66(d)(1)(B), UCMJ, FACTUAL SUFFICIENCY REVIEW, states:

> (i) In an appeal of a finding of guilty under subsection (b), the Court may consider whether the finding is correct in fact upon a request of the accused if the accused makes a specific showing of a deficiency of proof.

> (ii) After an accused has made a showing, the Court may weigh the evidence and determine controverted questions of fact subject to—

> (I) appropriate deference to the fact that the trial court saw and heard the witnesses and other evidence; and

(II) appropriate deference to findings of fact entered into the record by the military judge.

(iii) If, as a result of the review conducted under clause (ii), the Court is clearly convinced that the finding of guilty was against the weight of the evidence, the Court may dismiss, set aside, or modify the finding, or affirm a lesser finding.

10 U.S.C. § 866(d)(1)(B).

"[T]he requirement of 'appropriate deference' when a CCA 'weigh[s] the evidence and determine[s] controverted questions of fact' . . . depend[s] on the nature of the evidence at issue." *United States v. Harvey*, ___ M.J.___, No. 23-0239, 2024 CAAF LEXIS 502, at *8 (C.A.A.F. 6 Sep. 2024) (second and third alterations in original). It is within this court's discretion to determine what level of deference is appropriate. *Id.*

"[T]he quantum of proof necessary to sustain a finding of guilty during a factual sufficiency review is proof beyond a reasonable doubt, the same as the quantum of proof necessary to find an accused guilty at trial." *Id.* at *10 (internal quotation marks omitted).

In order for this court "to be 'clearly convinced that the finding of guilty was against the weight of the evidence,' two requirements must be met." *Id.* at *12. "First, the CCA must decide that the evidence, as the CCA *has weighed it*, does not prove that the appellant is guilty beyond a reasonable doubt. Second, the CCA must be clearly convinced of the correctness of this decision." *Id.*

To find Appellant guilty of a violation of Article 90, UCMJ, as charged, the Government was required to prove, beyond a reasonable doubt, that (1) Appellant received a lawful command from his superior commissioned officer, (2) the person that gave the lawful command was in fact Appellant's superior commissioned officer, (3) Appellant then knew the superior commissioned officer was his superior commissioned officer, and (4) Appellant willfully disobeyed such lawful command on divers occasions. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 16.b.(1)–(4).

To find Appellant guilty of a violation of Article 128b, UCMJ, as charged, the Government was required to prove, beyond a reasonable doubt, that Appellant committed a violent offense against his spouse, the violent offense in Specification 2 of Charge III being that Appellant committed bodily harm to his spouse by unlawfully slapping her face with his hand with force or violence, and the violent offense in Specification 6 of Charge III being that Appellant committed bodily harm against his spouse by unlawfully grabbing her arm with his hand with force or violence. *MCM*, App. 2, 10 U.S.C. § 928b(1), Appendix A2-45.

**2. Analysis**

*a. Disobeying a Superior Commissioned Officer*

The Government provided two theories as to how Appellant disobeyed his superior commissioned officer, Maj AG, both of which are based on the MPOs Maj AG issued Appellant to "restrain[ ] from initiating any contact or communication with [JC] either directly or through a third party." The first theory alleges Appellant disobeyed this order by posting on his Twitter account grievances he had about JC. The second theory alleges Appellant disobeyed this order by searching for JC on the iPhone "Find My" app. Neither of these actions by Appellant meet the definition of "initiating contact or communication." The charged offense alleges Appellant was restricted from "initiating electronic contact" or "words to that effect," which is slightly different from the specific wording of the MPO. The difference in wording is of no importance to our analysis and conclusion on this issue. The crux of the issue is whether or not Appellant "initiated contact" with JC and thus, we must determine the meaning of that term.

There is no dispute Twitter and "Find My" are electronic apps, and communications and posts via these apps are electronic. We look at the meaning of "initiating contact" to make a determination as to whether Appellant's contact violated the MPO. The word "initiate" is a transitive verb that means "to cause or facilitate the beginning of." MERRIAM-WEBSTER, *Initiate*, https://www.merriam-webster.com/dictionary/initiate (last visited 3 Feb. 2025). The word "contact" as used in the MPO is a noun and means "an establishing of communication with someone or an observing or receiving of a significant signal from a person or object." MERRIAM-WEBSTER, *Contact*, https://www.merriam-webster.com/dictionary/contact (last visited 3 February 2025). Taken together, Appellant must have caused or facilitated the beginning of or established communication with JC or caused JC to observe or receive a significant signal from him.

The evidence to support his conviction on the issue of initiating contact with JC consists of his posting to the public on Twitter his grievances and feelings regarding JC and allegedly searching for her location on the "Find My" app. With respect to the tweets, JC was never asked how she became aware of them and testified she "happened to come across messages" from Appellant on Twitter. While she might have been the subject of words he posted to the public, they were not in fact messages sent to her. This scenario is akin to Appellant walking out into his front yard or a public square and yelling the words into the wind while JC happens to be passing by facilitating her knowledge that he is yelling into the wind about her. JC testified that she saw the tweets, but the Government failed to prove this was because Appellant "willfully" initiated contact with her. While JC testified the tweets were "directed at her," there is

no evidence this is so. She was the subject of the tweets, but there was no evidence Appellant sent them to her, attempted to induce another to send to her, or put them in a format that she would directly receive. Simply put, Appellant's conduct would not have established communication or caused JC to observe or receive a significant signal from him—in fact, it is her conduct, of which there is no evidence Appellant intended or had knowledge, of happening to come across the tweets that brought the content of the tweets to her attention.

With respect to the allegation Appellant used the "Find My" app to locate JC, Appellant argues there was no testimony elicited at trial that he had an iPhone at the time she received the notification from Apple informing her someone was trying to locate JC and there was no testimony or evidence that proved the email address connected to the notice did in fact belong to Appellant. This is true; however, even assuming Appellant attempted to discover JC's whereabouts using the "Find My" app and the app sent an automatic push-notification to JC informing her someone was trying to find her, this was not a request by Appellant reaching out asking JC to allow him to follow her, nor does it demonstrate Appellant willfully sent a "communication" or "significant signal" to JC. There is no evidence his intention was to communicate with JC. Simply put, this app is not a communication app and Appellant's attempt to locate JC's whereabouts, without more, does not meet the definition of "initiating contact."

We have reviewed the entire record and have decided that the evidence as we have weighed it does not prove that Appellant is guilty beyond a reasonable doubt. We are clearly convinced of the correctness of this decision and find the conviction for disobeying a superior commissioned officer on divers occasions is factually insufficient. Thus, we set aside Charge I and its specification and reassess the sentence.

### b. Domestic Violence

Appellant alleges Specifications 2 and 6 of Charge III are factually insufficient because (1) JC was the only witness and her testimony was the only direct source of evidence, and (2) JC's testimony was unreliable, in that she was dishonest, lacked sufficient memory, and had a motive to fabricate. We do not agree.

The charge of domestic violence in violation of Article 128b, UCMJ, in this case required the Government to prove Appellant committed a violent offense against his spouse. 10 U.S.C. § 928b. It is well-settled law that the testimony of one witness may be enough to meet the burden beyond a reasonable doubt so long as the factfinder finds the witness's testimony relevant and sufficiently credible. *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006).

With respect to Specification 2, JC said the slap was predicated on an argument she and Appellant had because she was crying due to arguments they had earlier that day. Evidence in the record supports the contention that Appellant had become physically aggressive with JC when he was upset. With respect to Specification 6, much of JC's testimony was corroborated with Prosecution Exhibit 1, the CCTV footage. Having only one witness to support a specification is not, in and of itself, a deficiency in proof and in this case there was supporting evidence to corroborate JC's testimony.

We have looked at Appellant's assertions that JC was unreliable, in that she was dishonest, lacked sufficient memory, and had a motive to fabricate. We are not convinced she had a compelling motive to fabricate and in the context of the entire record of trial, we do not agree that any lapses in memory or inconsistencies in testimony were of a nature to discredit her testimony such that we are clearly convinced that the finding of guilty was against the weight of the evidence.

## B. Sentence Reassessment

### 1. Law

We have broad discretion first to decide whether to reassess a sentence, and then to arrive at a reassessed sentence. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *Id*. at 15–16 (citations omitted).

If we cannot determine that the sentence would have been at least of a certain magnitude, we must order a rehearing. *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000).

### 2. Analysis

Because we set aside Charge I and its specification, we must determine if we should order a rehearing or reassess the sentence. We find we are able to reassess the sentence. The military judge's segmented sentence included 35 days for willfully disobeying the lawful command of his superior commissioned

officer and 30 days each for the two domestic violence convictions, to run concurrently for a total sentence to confinement of 35 days. The remaining portions of the sentence included forfeiture of $200.00 pay per month for two months, hard labor without confinement for eight days, reduction to the grade of E-2, and a reprimand. Setting aside the conviction for willfully disobeying his superior commissioned officer, the specification for which the military judge adjudged the most confinement, reduces the total adjudged confinement to 30 days. Considering all the matters of record, we are confident that the military judge would have adjudged at least confinement for 30 days, forfeiture of $200.00 pay per month for two months, and a reduction to the grade of E-2 for the domestic violence offenses. We therefore reassess to that sentence.

## II. CONCLUSION

The findings of guilty as to the Specification of Charge I and Charge I are **SET ASIDE and DISMISSED WITH PREJUDICE**. The findings of guilty for Specifications 2 and 6 of Charge III and Charge III are **AFFIRMED**. We reassess the sentence to confinement for 30 days, forfeiture of $200.00 pay per month for two months, and reduction to the grade of E-2. The findings, as modified, and the sentence, as reassessed, are correct in law and fact, and no additional error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the reassessed sentence is **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court