# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 40303 (f rev)**

_____

**UNITED STATES**
*Appellee*

**v.**

**Jason M. BLACKBURN**
Airman Basic (E-1), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 4 April 2024

_____

*Military Judge:* Christopher D. James.

*Sentence:* Sentence adjudged on 30 March 2022 by GCM convened at Little Rock Air Force Base, Arkansas. Sentence entered by military judge on 21 June 2022: Dishonorable discharge, confinement for 14 years, forfeiture of all pay and allowances, and a reprimand.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Samantha P. Golseth, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major Lecia E. Wright, USAF; Major Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and KEARLEY, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge GRUEN and Judge KEARLEY joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

ANNEXSTAD, Senior Judge:

Appellant was tried by a general court-martial at Little Rock Air Force Base (AFB), Arkansas. Contrary to his pleas, a military judge found Appellant guilty of two specifications of aggravated sexual contact on divers occasions with a child that had not attained the age of 12 years (Specifications 1 and 2 of Charge I), in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920; and one specification of rape of a child that had not attained the age of 12 years on divers occasions (Specification 1 of Charge III), one specification of rape of a child that had not attained the age of 16 years on divers occasions (Specification 3 of Charge III), and four specifications of sexual abuse of a child that had not attained the age of 16 years on divers occasions (Specifications 5–8 of Charge III), in violation of Article 120b, UCMJ, 10 U.S.C. § 920b.[1,2,3] The military judge sentenced Appellant to a dishonorable discharge, confinement for 14 years, forfeiture of all pay and allowances, and a reprimand.[4] The convening authority suspended the adjudged forfeitures for six

---

[1] References in this opinion to the punitive articles of the UCMJ concerning Charge I are to the *Manual for Courts-Martial, United States* (2008 ed.) and those concerning Charge III are to the *Manual for Courts-Martial, United States* (2012 ed.). All other references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[2] Concerning one specification of sexual abuse of a child (Specification 8 of Charge III), the military judge excepted the words "on divers occasions," and found Appellant not guilty of the excepted words.

[3] One charge and specification of rape (Specification 1 of Charge I) was withdrawn and dismissed without prejudice before trial. Appellant was acquitted of one specification of aggravated sexual contact with a child (Specification 3 of Charge I), one specification of indecent liberties with a child (Specification 4 of Charge I), one specification of attempted aggravated sexual contact with a child (Specification of Charge II), and two specifications of rape of a child (Specifications 2 and 4 of Charge III).

[4] Appellant committed all the convicted offenses prior to 1 January 2019. Accordingly, the military judge was required to impose a unitary sentence. *See, e.g.*, *United States v. Harrington*, 83 M.J. 408, 416 (C.A.A.F. 2023) (explaining former sentencing rule in which military judges would impose "a single sentence that accounts for all the offenses for which the defendant was found guilty rather than distinct sentences for each individual offense of conviction").

months, waived the automatic forfeitures, provided language for the reprimand, and approved the remainder of the sentence.[5]

On 28 June 2023, Appellant raised ten issues which we have reworded: whether (1) Appellant's convictions for rape of a child, aggravated sexual contact with a child, and sexual abuse of a child are legally and factually sufficient; (2) the military judge erred in allowing the Government to admit Appellant's conviction for indecent recording under Mil. R. Evid. 414; (3) the military judge erred in allowing the Government to admit Appellant's conviction for sexual abuse of a child under Mil. R. Evid. 414; (4) the military judge erred in admitting the videos which formed the basis for Appellant's prior conviction for indecent recording; (5) Appellant's record of trial is incomplete; (6) trial counsel committed prosecutorial misconduct during his findings argument; (7) Appellant's sentence is inappropriately severe; (8) Appellant was denied his right to a unanimous verdict; (9) the Government's prosecution of Appellant violated the prohibition against double jeopardy found in the Fifth Amendment to the United States Constitution[6] and Article 44, UCMJ, 10 U.S.C. § 844; and (10) Appellant was denied his right to a unanimous verdict at his previous 2017 court-martial.[7]

We find Appellant affirmatively waived issues (2) and (3). "[U]nder the ordinary rules of waiver, [an a]ppellant's affirmative statements that he had no objection to their admission of evidence . . . operate[s] to extinguish his right to complain about their admission [of such evidence] on appeal." *United States v. Ahern*, 76 M.J. 194, 198 (C.A.A.F. 2017) (citing *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009)). Although we recognize we have the ability to pierce Appellant's waiver, we decline to do so here. *See United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted).

As to issue (5), Appellant contends in his brief that the record of trial was incomplete in that it was missing the attachments to Appellate Exhibit VIII, *Defense Motion for Appropriate Relief for the Unreasonable Multiplication of Charges*. On 11 September 2023, we remanded this case to the Chief Trial Judge, Air Force Trial Judiciary, for correction under Rule for Courts-Martial (R.C.M.) 1112(d) to account for the three missing attachments. *See United States v. Blackburn*, No. ACM 40303, 2023 CCA LEXIS 386, at *2 (A.F. Ct.

---

[5] We note that the convening authority's decision to suspend "the adjudged forfeitures of total pay and allowances for six months" was not memorialized on the entry of judgment. Appellant has not raised any prejudice regarding this error, and we find none.

[6] U.S. CONST. amend. V.

[7] Appellant personally raised issues (7), (8), (9), and (10) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Crim. App. 11 Sep. 2023) (order). On 13 October 2023, Appellant's case was re-docketed with this court. We agree with the parties that the record of trial is complete and find this issue is resolved.

With respect to issues (8), (9), and (10), we have carefully considered Appellant's contentions and find they do not require discussion or warrant relief. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant joined the Air Force in 2005. In 2010, he was reassigned to Little Rock AFB where he met MA, whose daughter, ES, was on Appellant's brother's youth soccer team. ES was born in May 2003. Appellant and MA eventually dated and lived together off and on before marrying in August 2012. MA and Appellant had two other children together in 2012 and 2015.

During 2012, Appellant moved by himself to Keesler AFB, Mississippi. MA and ES initially stayed in Arkansas so that ES could finish her semester in school before eventually joining Appellant in Mississippi in January 2013. While in Mississippi, they lived together as a family in two different houses. Appellant's brother and his family lived with them for a few months at the second home. During this time, Appellant, MA, and their children used the bathroom in the master bedroom.

ES's biological father, JS, and stepmother, LS, were married from 2012 to 2017.[8] LS first met ES in 2010. When ES lived in Arkansas, JS and LS had custody of her every other weekend. The custody arrangement changed when ES moved to Mississippi, so JS and LS only saw ES over spring break, half of the summer, Thanksgiving break, and half of Christmas break. ES and LS had a close relationship that continued after LS and JS divorced.

### A. Appellant's Prior Court-Martial - 2017

In September 2017, Appellant was convicted, contrary to his pleas, at a separate general court-martial at Keesler AFB. The charges resulting in Appellant's prior conviction stem from events that took place on the night of 20 April 2016, as more fully described in *United States v. Blackburn*, No. ACM 39397 (rem), 2021 CCA LEXIS 212, at *1 (A.F. Ct. Crim. App. 30 Apr. 2021) (unpub. op.). Specifically, Appellant was convicted of one specification of sexual abuse of a child, in violation of Article 120b, UCMJ (*Manual for Courts-Martial, United States* (2012 ed.) (2012 *MCM*)), for requesting ES send him nude

---

[8] At the time of Appellant's trial JS and LS were divorced, and LS's initials were LB.

photographs of herself, and one specification of indecent recording, in violation of Article 120c, UCMJ, 10 U.S.C. § 120c (2012 *MCM*), for secretly video recording ES while she was undressed in the bathroom. During her testimony at that trial, ES denied Appellant had touched her inappropriately.

**B. ES's February 2020 Allegations**[9]

Following the events that led to Appellant's 2017 court-martial, ES began seeing a therapist to help with nightmares she was having which related to Appellant. In January 2020, during an appointment with her therapist, Dr. HT, ES told Dr. HT that Appellant had sexually abused her, which abuse Dr. HT, as a mandatory reporter, had to report to law enforcement. Based on her testimony at trial, ES had intended to keep the abuse a secret forever, but inadvertently "blurted it out" to Dr. HT in a counseling session.

When ES was approximately 6 or 7 years old, Appellant began touching ES during nap times while they were living together in Arkansas. At that time, Appellant worked nights and was home alone with ES during the day while MA worked. According to ES, Appellant would take ES to the bedroom for "nap time." During these "naps" Appellant would "lead [ES] into [her] mom's bedroom" and would tell her, "[O]h come on, give me hug," and then would roll her over on top of him. He would position ES on top of him with their stomachs touching. Appellant would then hold her hips and buttocks to move her around "on top of his penis." When asked how she responded to this, ES stated she did not do anything, she would just lay there. On multiple occasions, Appellant removed their pants and underwear while this occurred. Appellant frequently touched her vagina, breasts, and buttocks over and under her clothing. On a few occasions, Appellant placed ES's hand on his penis over and under his clothing. ES testified that she would normally just leave her hand on his penis and if she pulled it away Appellant would "put it back on his penis." Appellant frequently told ES what he did was "[their] little secret." ES explained that she understood "that nobody else could know about [their little secret]."

Appellant's conduct continued after the family moved to Mississippi. There, Appellant would touch ES's buttocks, chest, and vagina over and under her clothes almost every night after her mother went to sleep. Appellant continued to place ES's hand on his penis on occasion. Appellant's sexual acts progressed to performing oral sex on ES and penetrating her vagina with his fingers. According to ES, Appellant would sometimes lay on top of her with his penis touching her vagina while both of them had their pants down. Appellant once did this while moving back and forth and left a wet spot on the bed, which

---

[9] Unless otherwise noted, the following information is derived from ES's testimony at trial.

they cleaned up with MA's purple hair dryer. Appellant also once exposed his genitalia to her. ES testified that Appellant continued to remind her about "[their] little secret."

ES described that there were times when she attempted to communicate that she did not want to continue to be sexually abused. She described an occasion in Mississippi where she told Appellant that she did not think that what they were doing was right and that she did not want it to continue. ES stated:

> We had -- we had gone to the store and we were -- we were sitting in -- I believe it was his truck and just sitting in the parking lot. And I don't know exactly how . . . the conversation got brought up, but I was telling him that I didn't think it was right and that I didn't want to do anything else. And he -- he insist -- he -- he kept asking me like who told me that it was bad, like it's okay to do, and eventually he finally said, "Before we stop everything, I want to take a take a shower with you."

During direct examination by circuit trial counsel, ES described another occasion when Appellant was performing oral sex on her:

> Q. . . . [W]hile he's doing this to you, what are you doing?
>
> A. I was just laying [sic] there. I wasn't really doing anything.
>
> Q. What's going through your mind?
>
> A. I don't exactly remember. I remember I had kind of put my hand on his head and like kind of tried to push him away, but he wouldn't stop and so I just kind of gave up and just still laid [sic] there until he was -- he felt like he was done.
>
> Q. What was the purpose of you trying to push his head away?
>
> A. Because I didn't -- I didn't want him to do that anymore.
>
> Q. Did he say anything to you while he was doing this to you?
>
> A. No.

ES also described Appellant's usual reaction to her feelings of not wanting the abuse to continue:

> Well, there was -- sometimes when I -- when he could tell that I didn't want to do anything or there was a certain instance when I did tell him no, he would -- I feel like he would try to hurt my feelings and he wouldn't come into my room and say goodnight to me at all. He just wouldn't talk to me. Sometimes he wouldn't play games with me.

She also testified that on these occasions Appellant continued to remind her about "[their] little secret," and would sometimes "bribe" her to keep doing things with Appellant. Specifically, ES stated that Appellant would sometimes hint at getting her another cat, because she loved cats, if she continued to engage in the behavior with him.

ES also described an occasion where Appellant's response was more forceful:

> We were in the first house in Mississippi, and we were in their bedroom. I'm not sure where my mom was again. She might have been at school. I think I had been doing something in their bathroom and . . . he was just laying [sic] on the bed and kind of on his back. And he . . . asked me if I wanted to touch him, and . . . I said no. And he kind of said, "Well, come feel it," and I told him no. And then . . . he pulled down his shorts and he was like, "Look at it." And I wouldn't turn around. I didn't want to look at it. . . .
>
> . . . .
>
> He -- I believe he pulled his shorts back up, and then he -- he was standing up beside the bed and he -- he pushed -- he pushed my head into his penis.

Later in her testimony, ES discussed the events that led to Appellant's 2017 court-martial. ES testified that she discovered Appellant had been secretly video recording her on his camera while she was undressed in the bathroom. After confronting Appellant, she immediately went to her bedroom to call her father, JS. ES stated that Appellant followed her into her bedroom, had her phone, and before giving her phone back, warned her "to be careful of what [she] say[s] because [she] could break up the whole family."

ES acknowledged she did not disclose all of Appellant's abuse leading up to the prior indecent-recording case. She explained that she felt scared, embarrassed, and worried she would have angered her parents for not revealing it sooner. She "was scared that somehow [Appellant] would find out that [she] shared more of [their] little secret than [she] was supposed to and that he would find a way to get back at [her]." She also acknowledged these feelings were a "heavy weight" for her to carry and that she kept the "secret" because she did not want anybody else to look differently at her or be disappointed in her.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

On appeal, Appellant contends his convictions for rape of a child, aggravated sexual contact with a child, and sexual abuse of a child are legally and factually insufficient. Specifically, Appellant asserts that ES was not a credible witness and had a motive to provide false testimony because she did not want Appellant released from confinement for his previous offenses. Concerning his conviction of rape of a child that had attained the age of 12 years but not attained the age of 16 years (Specification 3 of Charge III), Appellant argues that the Government presented insufficient evidence on the element of force. Additionally, Appellant argues the military judge misunderstood this offense and the other offenses detailed in the first four specifications of Charge III, and as a result, it is impossible to know whether the military judge correctly found Appellant guilty of rape, as charged, rather than sexual assault, which was not charged. Appellant requests we set aside the findings and sentence for these offenses. We disagree with Appellant's contentions and find no relief is warranted.

#### 1. Additional Background

##### a. Misrepresentation of Offenses

On 1 December 2021, the trial defense counsel filed a motion *in limine* to exclude evidence under Mil. R. Evid. 414. In that motion, trial defense counsel incorrectly summarized the charges concerning Specifications 1–4 of Charge III by stating that Appellant was accused of two specifications of sexual assault of a child and two specifications of rape of a child. Appellant was not charged with any specifications of sexual assault of a child. Rather, Appellant was charged with four specifications of rape of a child: two for conduct when ES had not attained the age of 12 years, and two for conduct when ES had not attained the age of 16 years and therefore requiring proof of force.

Prior to the military judge's ruling, Appellant was arraigned on 1 March 2022 at which trial counsel read in open court the general nature of the charges and referred to Specifications 1–4 of Charge III as "four specifications of sexual assault of a child."

On 18 March 2022, the military judge presented his written ruling on both defense motions *in limine*, and incorrectly stated in his reference to Specifications 1–4 of Charge III that Appellant was charged with "two specifications of sexual assault of a child . . . in violation of Article 120b, UCMJ [(2012 *MCM*)]."

During his closing argument on findings, the circuit trial counsel did not address the Government's theory of unlawful force, whether committed by use

of parental authority or otherwise, on the specification, which allegedly happened when ES was between the ages of 12 and 16 years.

On 30 March 2022, the military judge announced his findings for each charge and specification on the charge sheet. The military judge did not specify the elements he considered for each offense. There were no discussions about the elements of the charges and specifications in the record of Appellant's court-martial. Trial counsel did, however, specifically mention "rape" during his sentencing argument.

### b. Evidence Presented at Trial

In addition to ES's testimony described *supra,* during findings, the military judge heard evidence from an expert witness, Dr. SP, a licensed clinical psychologist, about delayed disclosure of sexual abuse. Dr. SP testified that the vast majority of child sex abuse cases go unreported, with many others reported after significant delay. Dr. SP identified external barriers that contribute to delayed reporting, including a child's age at the time of abuse, the severity of the abuse, and the relationship between the child and abuser. On this point Dr. SP elaborated:

> And then, one of the biggest factors is the age differential between the abuser and the child. That power dynamic is extremely critical where the child feels, you know, significantly subservient, I guess, is one way. They feel not in control of the situation. They feel that the abuser, the accused rather, you know, who's older, who's more powerful, so there is significant difficulty for them to report because of the age differential.

Dr. SP also highlighted that:

> When there is familial relationships or family like relationships, there is -- that's one of the primary barriers in reporting. When the abuser is part of the family somehow, you know, and not necessarily biological, you know, a parent or sibling or what have you, but they are in the caregiver role or in the parental role, the likelihood of reporting is significantly diminished. So, that's a really big factor. And that's because of various reasons. The child may have multiple relationships or feel like they have multiple relationships with the perpetrator where they feel, you know, that this is a part of my family, you know, I love them, I have fun with them, they, you know, they have close relationships with other family members, whether it's the mom or the other siblings in the family. So, just the nature of the family system itself creates a significant barrier. And then the fact that there is, you know, these dual relationships where they enjoy spending

time with, you know, the family member. There can be dependency needs too, like they are the, you know, breadwinner and things like that.

Dr. SP also explained internal factors that contribute to delayed reporting. She testified that "internal factors are the psychological factors, the feelings of shame, feelings of embarrassment, responsibility and guilt, self-blame. All of those feelings that are precipitated by the abuse and their engagement in the abuse."

The military judge also heard testimony from ES's biological father, JS. He testified regarding his lone interaction with Appellant:

I was trying to tell him it wasn't right for him to not let [ES] cut her hair. She wanted to cut a few inches off of her hair. Her mom was fine with it. I was fine with it. I tried to tell him, "It's not right for you to take that upon yourself to tell her no." I believe she was 11 going on 12, or 12 going on 13, somewhere in there. Basically, he cut me off. He told me to my face, he shook his head no and looked me in the eyes and told me no matter what I did or said would affect how he raises his daughter.

The Government also presented testimony by ES's stepmother, LS, who testified she noticed changes in ES's demeanor starting around 2013 when ES moved to Mississippi. LS described ES as normal, generally happy, and talkative before the move, but "withdrawn" and less talkative thereafter. LS stated that ES still appeared "depressed" and "withdrawn" after Appellant's first court-martial in 2017. LS testified she learned of the recently charged offenses in February 2020.

Finally, the Government presented testimony from MA, who confirmed she worked days and Appellant worked the overnight shift while they lived in Arkansas. MA also testified that Appellant stayed home with the children after they moved to Mississippi when she went to night school.

MA also described instances in Mississippi where she awoke during the night to find Appellant was not in bed with her. She stated on a few occasions she went to look for Appellant and found him coming out of ES's bedroom. MA testified Appellant told her he was checking on ES, which she found strange because she never observed him coming out of their other children's rooms. MA also confirmed she owned a purple hair dryer.

MA further testified about two occasions in Mississippi where she could tell the previously friendly relationship between ES and Appellant had deteriorated. Once, ES refused to stand next to Appellant while taking a family picture. Another time, ES refused to make a birthday card for Appellant.

**2. Law**

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). The term "reasonable doubt" does not mean evidence free from conflict. *See Lips*, 22 M.J. at 684. This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

"[T]he finder of fact at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

A military judge is presumed to know and follow the law absent clear evidence to the contrary. *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007).

Appellant was convicted of aggravated sexual contact with a child on divers occasions, in violation of Article 120, UCMJ (Specifications 1 and 2 of Charge I), which required the Government to prove beyond a reasonable doubt: (1) Appellant engaged in sexual contact with a child, and (2) the child had not attained the age of 12 years at the time of the sexual contact. *See Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*), App. 21, at A21-7, ¶ 45.b.(7)(a).

Appellant was also convicted of rape of a child on divers occasions (Specification 1 of Charge III), in violation of Article 120b, UCMJ, which required the Government to prove beyond a reasonable doubt as charged in this case: (1) Appellant committed a sexual act upon a child causing penetration, however slight, of the vulva of the child by any part of the body; (2) the child had not attained the age of 12 years at the time of the sexual act; and (3) Appellant did so with the intent to gratify his sexual desire. *See* 2019 *MCM,* App. 22, at A22-15, ¶ 45b.b.(1)(a).

To convict Appellant of rape of a child on divers occasions (Specification 3 of Charge III), in violation of Article 120b, UCMJ, the Government was required to prove beyond a reasonable doubt as charged in this case: (1) Appellant committed a sexual act upon a child by causing penetration, however, slight, of the vulva of the child by any part of the body; (2) the child had attained the age of 12 years at the time of the sexual act but had not attained the age of 16 years; (3) Appellant did so by using force against that child; and (4) Appellant did so with the intent to gratify his sexual desire. *See* 2019 *MCM*, App. 22, at A22-15, ¶ 45b.b.(1)(b).

"In the case of a parent-child or similar relationship, the use or abuse of parental or similar authority is sufficient to constitute the use of force." 2019 *MCM*, App. 22, at A22-14, ¶ 45b.a.(h)(2).

Our superior court has recognized a type of "constructive force" that occurs when a parent, or stepparent, exerts "moral, psychological or intellectual" control over a child that is the compulsory equivalent of a threat or intimidation. *United States v. Palmer,* 33 M.J. 7, 9 (C.M.A. 1991) (citations omitted).

More recently, our sister service court explained,

> Constructive force exists where a child acquiesces because of duress or a coercive atmosphere created by a parent (or stepparent, as in this case). Where constructive force is present, a court is permitted to conclude that the youth or vulnerability of the child, when coupled with appellant's position of authority, created a situation in which explicit threats or displays of force are not necessary to overcome the child's resistance. Where evidence of constructive force is offered, the question is whether the child merely acceded to the will of the parent because of the moral, psychological, or intellectual force a parent figure wields over a child.

*United States v. Spicer*, NMCCA 201000241, 2010 CCA LEXIS 397, at *6 (N.M. Ct. Crim. App. 21 Dec. 2010) (unpub. op.) (citing *Palmer,* 33 M.J. at 9).

Appellant was also convicted of sexual abuse of a child involving sexual contact on divers occasions (Specifications 5–7 of Charge III), in violation of Article 120b, UCMJ, which required the Government to prove beyond a reasonable doubt as charged in this case: (1) Appellant committed a sexual contact upon a child by touching, either directly or through the clothing, the genitalia, breast, and buttocks of the child; and (2) Appellant did so with the intent to gratify his sexual desires. *See* 2019 *MCM*, App. 22, at A22-16, ¶ 45b.b.(4)(a).

To convict Appellant of sexual abuse of a child involving indecent exposure (Specification 8 of Charge III), in violation of Article 120b, UCMJ, the Government was required to prove beyond a reasonable doubt: (1) Appellant intentionally exposed his genitalia by any means; and (2) Appellant did so with the intent to gratify his sexual desire. *See* 2019 *MCM*, App. 22, at A22-16, ¶ 45b.b.(4)(c).

### 3. Analysis

Regarding the offenses of which Appellant was convicted, we find the Government introduced sufficient evidence of Appellant's guilt during the court-martial. In the court's view, the most significant evidence came directly from the victim, ES, who described in convincing detail the progression of sexual misconduct Appellant committed against her beginning when she first met Appellant. During ES's testimony, she recounted how Appellant began sexually abusing her during nap times when she was approximately 6 years old and continued to rape and sexually abuse her for approximately seven years in two different states at three different residences. We find ES's testimony alone is sufficient to support conviction for the charged offenses. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to testify credibly. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (the testimony of a single witness may satisfy the

Government's burden to prove every element of a charged offense beyond a reasonable doubt).

Appellant's primary contentions on appeal are that ES lacked credibility and had a motive to provide false testimony. We note that these same contentions were raised by Appellant's trial defense counsel during trial. Appellant argues again that there is substantial reason to question ES's credibility based on her contradictory testimony at Appellant's 2017 court-martial where she denied being sexually abused or touched in any way by Appellant. ES reasonably explained the change in her testimony during Appellant's court-martial where she was subject to extensive cross-examination on this point. ES testified she never intended to report the additional abuse out of fear, embarrassment, and other plausible reasons, but inadvertently revealed it during an appointment with her therapist. The forensic psychologist who testified at trial provided support for ES's explanation.

In considering and rejecting Appellant's arguments, we also focused our attention on all the corroborating evidence admitted during trial, including the testimony of Dr. SP, who discussed both internal and external factors that commonly cause delayed reporting. We also considered the testimony of MA, who confirmed numerous key details in ES's testimony, to include MA seeing Appellant on several occasions coming out of ES's room at night. JS's testimony also demonstrated Appellant's controlling behavior toward ES. Finally, we considered the testimony from LS about the changes she witnessed in ES's personality during the period of abuse. These all favor crediting ES's version of events. We are also cognizant "the finder of fact at the trial level is always in the best position to determine the credibility of a witness." *Peterson*, 48 M.J. at 83.

Appellant also contends that evidence of force in the record was insufficient to sustain the findings of guilty for rape of a child (Specification 3 of Charge III). We disagree. We find sufficient evidence in the record to establish that a rational finder of fact could have found that ES acceded to Appellant's abuse of parental authority. As we noted above, the age and vulnerability of a child, coupled with a parent's or stepparent's position of authority, can create a situation where explicit threats or displays of force are not necessary to overcome a child's resistance. The record before us clearly establishes that Appellant was an authority figure for ES and that he exerted "moral, psychological and intellectual force" over her that was "the compulsory equivalent of a threat or intimidation." *Palmer*, 33 M.J. at 9. In support of this conclusion, we note that Appellant's methodical abuse of ES began when ES was approximately 6 years old and continued until she was approximately 14 years old. The record also established that the sexual abuse progressed over time, beginning with touching over the clothes and culminating in Appellant penetrating ES's vulva with

his fingers on multiple occasions. We find that Appellant's sexual abuse of ES was effectuated by coercive behavior and statements, including frequent reminders for ES to keep "[their] little secret," periods of disregard when ES refused his advances, and evidence that Appellant offered incentives—such as another cat—if she continued to allow the abuse. We also find the record establishes the fear, shame, embarrassment, and responsibility ES felt concerning the sexual abuse, to include her desire not to face retaliation from Appellant or destroy her relationship with her family. We are cognizant of a child's need to feel accepted by their parental figures, especially in the pre-teen and teen years, and the ostracization of a parent towards a child is significant psychological control which in this case culminated in the continued abuse of ES. We conclude the evidence in the record sufficiently demonstrates that ES acceded to Appellant's sexual demands based on parental compulsion, and that the evidence was sufficient to establish the element of force beyond a reasonable doubt.

We conclude that viewing such evidence in the light most favorable to the Prosecution demonstrates a rational trier of fact could have found the essential elements of all the offenses beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (quoting *Turner*, 25 M.J. at 325).

Appellant's final point of contention on appeal is that the military judge was confused as to the offenses with which Appellant was actually charged. Specifically, Appellant points to the fact that during pretrial motions practice both the parties and the military judge mischaracterized the specifications for rape of a child as sexual assault. We concur with Appellant that the parties and the military judge mischaracterized the offenses by referring to "sexual assault" vice "rape" of a child. However, we are not convinced that it demonstrates that the military judge was confused during trial proceedings as to the offenses or that his findings were ambiguous.

In support of this conclusion, we first note that the offenses were correctly identified as rape of a child on the charge sheet, and that this satisfied the Government's due process notice obligations for informing Appellant of the conduct he needed to defend against. *See United States v. Simmons*, 82 M.J. 134, 140 (C.A.A.F. 2022) (citations omitted). Second, as detailed above, our analysis of the legal and factual sufficiency of the offenses—specifically the offenses for rape of a child—provides ample support for the conclusion the Government proved each and every element of the charged offenses beyond a reasonable doubt. Third, we note that both trial counsel and trial defense counsel elicited evidence bearing on the question of whether Appellant used force,

specifically constructive force—via abuse of parental authority—during their examination of the witnesses during Appellant's court-martial, which indicates that all parties understood the charged offenses. Fourth, we find that the military judge was especially discerning in his consideration of the evidence presented at trial, as evidenced by his finding Appellant not guilty of five specifications—including two specifications of rape of a child. On this particular point, we highlight that the military judge also excepted specific language from another specification on the charge sheet. Finally, while trial counsel did not refer to the offenses as rape offenses during findings, our review of the record details that trial counsel argued multiple times during his sentencing argument that Appellant raped ES, with no objection from the trial defense counsel or correction from the military judge. Considering all these circumstances, we are convinced the record supports the conclusion that the military judge found the Government proved beyond a reasonable doubt the elements of the offenses of rape of a child (Specification 1 of Charge III) and rape of a child by force (Specification 3 of Charge III).

## B. Video Evidence of ES in the Bathroom

Appellant further argues the military judge abused his discretion by allowing the Government to admit the video evidence Appellant captured of ES in the bathroom which formed the basis of Appellant's prior conviction for indecent recording. Specifically, Appellant argues the military judge erred in misapplying the balancing test under Mil. R. Evid. 403. We find that the military judge did not abuse his discretion in weighing the probative value of such evidence against the danger of unfair prejudice, and that no relief is warranted.

### 1. Additional Background

During Appellant's court-martial, the Government sought to introduce the video which gave rise to Appellant's first court-martial conviction. Appellant objected to the evidence solely based on a danger of unfair prejudice under Mil. R. Evid. 403. Specifically, Appellant's trial defense counsel stated,

> [W]e believe that it would be more prejudicial than probative for you to view this simply because the videos are not going to show you any touching whatsoever. It's just the video set up and what was filmed in the bathroom, for which our client has already been successfully prosecuted [and] . . . punished for. And we think this just unfairly prejudices him under the circumstances, especially since there's no actual touching or attempted touching in any way, shape, o[r] form that is notated in those videos. And further, we think that it unnecessarily revictimizes the victim on this particular charge for which he was convicted.

The military judge overruled Appellant's objection, stating:

[T]he court finds that the videos' probative value is not substantially outweighed by a danger of unfair prejudice. The probative value is high. It shows the accused planning and placing the video camera in different places in the bathroom, as well as it goes to the accused's gratification of his sexual desires in which the [G]overnment must prove for the specifications that are Charge III. While the prejudicial value is also high. It does not outweigh, let alone, substantially outweigh the probative value of the evidence. As military appellate courts have said many times, evidence of this nature is prejudicial, but just being prejudicial is not enough. It must substantially outweigh the probative value of the evidence.

Regarding the defense counsel's concern about re-victimization of [ES] based upon the court admitting -- the videos into evidence, [ES] -- this court appreciates the [D]efense's concern, but will state that the videos were never played in open court and were only viewed by the military judge after the proceedings. In addition, the contents of the videos have been discussed multiple times throughout this trial, and Prosecution Exhibit 4 is the result of those videos. The [D]efense's objection to [the video] under [Mil. R. Evid.] 403 and a cause for re-victimizing [ES] are overruled.[10]

Thereafter, the military judge entered the video evidence as Prosecution Exhibit 3.

### 2. Law

We review a military judge's decision to admit evidence over objection for abuse of discretion. *United States v. Hyppolite*, 79 M.J. 161, 164 (C.A.A.F. 2019) (citing *United States v. Phillips*, 52 M.J. 268, 272 (C.A.A.F. 2000)). A military judge abuses his or her discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable, or

---

[10] Prosecution Exhibit 4 was a five-page exhibit consisting of General Court-Martial Order No. 03, dated 27 December 2017, detailing Appellant's previous court-martial conviction.

clearly erroneous.'" *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (quoting *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010)).

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Mil. R. Evid. 401. Evidence is generally admissible absent a rule requiring otherwise. Mil. R. Evid. 402. Even when evidence is relevant, a military judge may prohibit its admission when the evidence's probative value is substantially outweighed by such considerations as unfair prejudice, confusion of the issues, or waste of time. Mil. R. Evid. 403.

Military judges have "wide discretion" in applying the Mil. R. Evid. 403 balancing test, which we will not overturn absent "clear abuse of discretion" when they explain their analysis on the record. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000).

### 3. Analysis

We conclude the military judge did not abuse his discretion in admitting the video evidence that Appellant captured of ES in the bathroom, which formed the basis of Appellant's prior conviction for indecent recording. The military judge had a substantial basis to find that Appellant's conduct in video recording ES showering in the bathroom tended to show his sexual interest in seeing her unclothed and, relatedly, his intent to gratify his sexual desires in committing the charged conduct. At Appellant's second court-martial, the military judge placed his analysis on the record, which we afford significant deference. *Manns,* 54 M.J. at 166. Recognizing that the military judge has a range of choices, we find his conclusions of law were within that acceptable range and not "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." W*hite*, 69 M.J. at 239.

## C. Trial Counsel's Findings Argument

Appellant also maintains several comments trial counsel made during his findings argument constituted improper remarks and prosecutorial misconduct. Specifically, Appellant contends trial counsel made improper comments bolstering ES's testimony and vouching for her credibility. Appellant did not, however, object to trial counsel's remarks before the military judge at the court-martial. We disagree with Appellant's claims, find no plain error in trial counsel's argument, and conclude no relief is warranted.

### 1. Additional Background

During circuit trial counsel's closing argument, which spanned nearly an hour, trial counsel submitted to the military judge, "[This case] really boils down to . . . this court's duty to determine [ES's] credibility. She's either believable or she's not. The testimony that she provided is believable or it's not."

Later during argument, the trial counsel stated:

> [T]here is this theme here, right? Is the "no" [from Appellant's previous court-martial] truthful or is what she's saying now truthful? That will be something that the court has to decide. But when you look at those two things and you say for someone who has been raised her entire life to tell the truth, to know the importance of telling the truth, someone who has exhibited to her parents that she is a truthful child, the most honest kid I know, which one seems to be something that *little child* would lie about? Saying no to keep that secret or *to fabricate probably the most despicable lie someone could ever tell about someone*? That really is these two things the court has to weigh here. One, a no because she is trying not to let that shame, that embarrassment, her own self guilt out *or the most disgusting and despicable lie that you can make up about someone. The lie that you almost have to be the spawn of Satan to make up about someone.*

(Emphasis added).

Circuit trial counsel specifically addressed the evidence about Appellant's actions to ensure ES continued to allow him to abuse her. Trial counsel argued Appellant would ignore ES as

> a way to bring her back into the fold, to keep her quiet, to keep abusing her. *It's emotional abuse is what it is, Your Honor. It's emotional abuse to effectuate the sexual abuse that he wants to continue happening.* He even bribed her. She tells you about that. That's her word, "He bribed me." *It's almost like a sexual abuse Stockholm's syndrome, almost.*

(Emphasis added).

During rebuttal argument, the circuit trial counsel further noted:

> [Trial defense counsel] said something, "[ES] wasn't very obedient. She didn't obey the court's rules to tell the truth. She lacks character for truthfulness." . . . So, now we're going from victim blaming for the way you dress, or the way you dance, or how many drinks you've had, to victim blaming for not divulging the abuse when you could have, when everything else points to the credibility of that young lady.

Defense counsel did not object to any of the above-referenced portions of trial counsel's closing and rebuttal arguments. After both counsel concluded their findings arguments, the military judge stated:

> Just to be clear for the record, religion was mentioned during the trial counsel's initial argument, it was mentioned yesterday by

> defense counsel when questioning [ES], it was mentioned in the rebuttal argument. The court is not going to consider religion just so that is clear. Religion has no bearing on my decision that I make in the case.

Neither counsel expressed any concerns over the military judge's statement.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

"Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006) (citation omitted).

Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"Improper argument" by trial counsel "is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). Counsel must limit arguments to evidence in the record and reasonable inferences that can be drawn from such evidence. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). By this standard, a prosecutor is fully permitted to comment on the Government's witnesses' credibility in summation when the accused made prior efforts to impeach those witnesses during the evidentiary phase of trial. *United States v. Young*, 470 U.S. 1, 12 (1985). On the other hand, a prosecutor may not "make arguments that 'unduly . . . inflame the passions or prejudices of the court members.'" *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (omission in original) (quoting *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983)). Trial counsel is also prohibited from discussing facts not in evidence or personal opinions about the truth or falsity of testimony or evidence. *See id.* at 58; *Fletcher*, 62 M.J. at 179; R.C.M. 919(b), Discussion.

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation[.]" *Baer*, 53 M.J. at 238 (quoting *United States v. Young*, 470 U.S. 1, 16 (1985)). "[I]t is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.* In judging the propriety of a prosecutor's remarks, "the lack of a defense objection is 'some measure of the minimal impact' of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

"When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). "We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

In a military judge alone trial we would normally "presume that the military judge is able to distinguish between proper and improper" argument. *Erickson*, 65 M.J. at 225.

### 3. Analysis

Since trial defense counsel did not object, we review trial counsel's closing and rebuttal arguments for plain error. We first address Appellant's primary claim that trial counsel improperly bolstered ES's credibility and vouched for her credibility. We see no support in the record for Appellant's contention. Trial counsel did not vouch for ES's credibility and did not at any time express a personal opinion as to ES's credibility. Rather, trial counsel argued in general that ES was a credible witness, highlighting for the military judge the evidence and testimony admitted at trial that supported this conclusion. This included referring to direct testimony from ES's father, JS, and stepmother, LS, who testified to ES's character for truthfulness. Trial counsel also framed his argument around reasonable and permissible inferences from the trial evidence when he referred to ES as a "little child" and noted she suffered both physical abuse and emotional abuse. Trial counsel's argument was also in direct response to trial defense counsel's focused attacks against ES's credibility.

Viewing trial counsel's argument within the context of the entire court-martial, we conclude Appellant has failed to establish plain or obvious error. Here, the Government's case was strong and included powerful testimony from ES and other witness accounts and evidence that supported her testimony. We

will not "surgically carve" out words and phrases from circuit trial counsel's argument. *Baer*, 53 M.J. at 238. In particular, we find trial defense counsel's failure to object to any of trial counsel's isolated comments in summation confirms the lack of significance of those remarks.

Even if we were to assume, for the sake of argument, that trial counsel's comments constituted plain or obvious error, we still conclude Appellant was not prejudiced. Here, the military judge, sitting alone, acted as the trier of fact. It is well-settled that military judges are "presumed to know the law and to follow it absent clear evidence to the contrary." *Erickson*, 65 M.J. at 225 (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). This presumption necessarily includes the military judge's ability to "distinguish between proper and improper" argument. *Id.* at 225. This presumption holds even where the military judge does not specifically note the argument is improper or state that he will not consider it. *Id.*

In Appellant's case, we find nothing in the record to suggest the military judge improperly considered any improper trial counsel argument. To this point, we note that the military judge specifically addressed on the record what he considered to be improper argument about religion and indicated that he would not be influenced by such improper argument. We also note the military judge's decision to acquit Appellant on five specifications is further indication the military judge was not unduly influenced by any comments made by circuit trial counsel during summations. We are confident Appellant was properly convicted on the basis of the evidence alone. *See Fletcher,* 62 M.J. at 184.

## D. Sentence Appropriateness

Appellant argues that his sentence to 14 years of confinement is inappropriately severe. Specifically, Appellant contends that his sentence failed to take into account that he has been remorseful and that he has been helpful to his family upon release from confinement after his 2017 court-martial. We find Appellant's sentence is not inappropriately severe.

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2016) (footnote omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009)). While we have great discretion in determining whether a particular sentence is appropriate,

we are not authorized to engage in clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

We have considered the nature and seriousness of the offenses and have given individualized consideration to Appellant's history and characteristics, including his record of service, and all other matters contained in the record. We find Appellant's sentence to 14 years' confinement is a substantial, but appropriate punishment for physically abusing and raping his stepdaughter. This is particularly so because Appellant repeatedly abused his role as a parental figure in ES's life by violating both her body and her trust spanning almost six years.

While we appreciate that Appellant has supported his family following his release from confinement and has shown remorse for the conduct of which he was previously convicted, the serious nature of the offenses he committed warrant the sentence he received. After careful consideration of all the matters contained in the record of trial, we conclude the sentence is not inappropriately severe.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court